**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MARK LEEMAN**
Cass County Conflict Public Defender
Leeman Law Offices
Logansport, Indiana

ATTORNEYS FOR APPELLEE:

**TRICIA L. THOMPSON**
Indiana Dep't of Child Services
Logansport, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**FILED**
Nov 20 2012, 9:22 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of J.R. and L.R., minor children, and Je.R., their father, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Je.R., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 09A05-1203-JT-152 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE CASS CIRCUIT COURT
The Honorable Leo T. Burns, Judge
Cause No. 09C01-1107-JT-10

**November 20, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Je.R. ("Father") appeals the involuntary termination of his parental rights to his children, J.R. and L.R. Father challenges the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Father is the biological father of J.R., born in August 2004, and L.R., born in May 2007.[1] The facts most favorable to the trial court's judgment reveal that in July 2010 the local Cass County office of the Indiana Department of Child Services ("DCS") received and substantiated a referral alleging that the parents were "involved in a violent domestic situation, the family home [had been] recently destroyed by fire, and the family ha[d] no stable or suitable home in which to reside with the child[ren]." *Appellant's App.* at 15. DCS initiated an investigation of the matter and discovered that Father was living in a tent on the property where the family trailer had burned down. Father informed the DCS assessment caseworker that he and the children were temporarily sleeping at the paternal grandfather's home at night. The children were either with the grandfather or with Mother at her camper during the weekdays. On the weekends, the children stayed with an aunt.

DCS also learned that Father had been arrested several days earlier in Jasper County on multiple drug-related charges including Class D felony possession of chemical reagents or precursors with intent to manufacture a controlled substance, Class D felony possession of methamphetamine, and Class A misdemeanor possession of paraphernalia. There were

---

[1] The parental rights of both children's biological mother, A.R. ("Mother"), were terminated by the trial court in its February 2012 judgment after Mother signed consents to voluntarily relinquish her parental rights. Mother does not participate in this appeal. Consequently, we limit our recitation of the facts to those pertinent solely to Father's appeal.

also allegations of an earlier shooting involving Father and Mother and a drug-related arrest of two individuals living in a motor home on the parents' property approximately two weeks after the fire. Based on all the information gathered during its assessment, DCS asked Father to submit to a drug screen. Father complied.

Upon learning that Father's drug screen result was positive for methamphetamine and marijuana, DCS took both children into emergency protective custody and filed petitions, under separate cause numbers, alleging J.R. and L.R. were children in need of services ("CHINS"). Shortly thereafter, the children were relocated to another relative placement. Following a hearing in August 2010, J.R. and L.R. were adjudicated CHINS, and a dispositional order was entered in October 2010.

As part of its dispositional decree, the trial court ordered that both children be formally removed from Father's custody and deemed wards of DCS. The dispositional order also directed Father to successfully complete a variety of tasks and services designed to address his parenting deficiencies and to facilitate reunification with the children. Among other things, Father was ordered to: (1) refrain from the use, manufacture, sale or distribution of any illegal or controlled substances; (2) successfully complete a substance abuse intensive out-patient program ("IOP") and follow all resulting recommendations; (3) obtain and maintain a legal source of income, as well as safe and stable housing; (4) successfully complete parenting classes and home-based counseling services; (5) participate in regular supervised visits with the children; and (6) maintain regular contact with DCS and notify caseworkers of any change in address, household composition, telephone number, or employment.

3

Father's participation in court-ordered services during the ensuing months was sporadic and ultimately unsuccessful. Father tested positive for amphetamine, methamphetamine, and marijuana in September 2010 and was positive for marijuana in December 2010. Although Father submitted to a substance abuse assessment in December 2010 and eventually successfully completed an IOP in March 2011, he failed to participate in the recommended follow-up treatment programs, including Narcotics Anonymous ("NA") and Alcoholics Anonymous ("AA"), after completing the IOP. Father also failed to maintain his sobriety following his participation in the IOP, testing positive for methamphetamine once in April 2011 and twice in June 2011. Positive test results for marijuana were likewise reported in June and July 2011, and Father tested positive for amphetamine in June 2011. Father could not be located for any additional drug screens after July 2011.

Father also continued to engage in criminal activities throughout the underlying CHINS cases. In January 2011, Father was arrested in Cass County on multiple drug-related charges including Class D felony possession of methamphetamine; Class A misdemeanor possession of paraphernalia, driving while suspended, and reckless possession of paraphernalia. Father later missed a court date and was "on the run" for approximately three months beginning in July 2011. *Tr*. at 17. While attempting to evade arrest, Father discontinued his participation in all reunification services. He also failed to visit with the children and cut-off all communication with DCS.

Based on Father's non-compliance and lack of progress in services, DCS filed petitions seeking the involuntary termination of Father's parental rights to J.R. and L.R. in

4

July 2011. A consolidated evidentiary hearing on the termination petitions was held in December 2011. During the termination hearing, DCS presented substantial evidence concerning Father's failure to successfully complete and/or benefit from a majority of court-ordered reunification services available throughout the underlying CHINS and termination cases. In addition, DCS established that Father had recently been arrested and incarcerated on outstanding warrants pertaining to his pending criminal charges, never successfully resolved his addiction issues, and remained incapable of providing the children with a safe and stable home environment. DCS also presented evidence showing the children were living together and thriving in pre-adoptive relative foster care.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On February 27, 2012, the trial court entered judgments terminating Father's parental rights to J.R. and L.R. Father now appeals.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

5

Here, in terminating Father's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B)    that one (1) of the following is true:
>
>> (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

6

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services; [and]
>
> (C) that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Father challenges the sufficiency of the evidence supporting the trial court's findings only as to subsections (b)(2)(B) and (C) of the termination statute cited above.

### I. Conditions Remedied/Threat to Well-Being

Indiana Code section 31-35-2-4(b)(2)(B) requires the trial court to find that only one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence before terminating parental rights. Here, the trial court determined that DCS established by clear and convincing evidence that there is a reasonable probability the conditions resulting in J.R.'s and L.R.'s removal or continued placement outside of Father's care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001),

7

*trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, DCS was not required to provide evidence ruling out all possibilities of change; rather, it needed to establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

On appeal, Father asserts that he "made a good decision regarding finding a home for the children after his house burn[ed] down and he started getting into trouble with the law" by finding a "safe, secure, and clean place for his children to live during this turbulent period." *Appellant's Br*. at 16. Father further claims that he has "responded well to drug treatment" in the past and "could find success in the future if he reenrolled in treatment." *Id.* at 17. Father also states that his "desire to reunite with his children encouraged him to remain off drugs" and that he "did not hide from his drug issues" but instead "admitted" he had a problem. *Id.* at 18. Father therefore contends that DCS failed to establish that the conditions resulting in the children's removal and continued placement outside his care would likely not be remedied.

In terminating Father's parental rights, the trial court made multiple findings regarding his unresolved substance abuse issues, parenting deficiencies, and lack of stability. Specifically, the court found that although Father initially "participated in and cooperated with the services provided to him," he nevertheless was unable to "obtain steady employment, or a stable, self-sufficient residence" during this "positive period." *Appellant's App.* at 87.[2] The trial court went on to find that after his relapse in July 2011, Father's "contact and cooperation with DCS ceased[,] and because of criminal charges filed in Jasper County and Cass County, [Father] was on the run and failed to participate in services." *Id.* The court also noted that Father "had no meaningful contact" with the children, failed to obtain employment and housing, and continued to have trouble with criminal cases in several counties during the summer and fall of 2011. Based on these and other findings, the trial court determined that there is a reasonable probability the conditions resulting in removal and continued placement of the children outside of Father's care would likely not be remedied. Our review of the record leaves us confident that clear and convincing evidence supports the trial court's findings cited above.

Although the evidence makes clear that Father initially participated in several of the recommended services, including a substance abuse evaluation, IOP, and supervised visitation with the children, he refused to follow through with the IOP post-treatment recommendations. Father then relapsed and began using illegal substances again

---

[2] For clarification purposes, we note that because DCS filed separate involuntary termination petitions for each child under separate cause numbers, the trial court issued separate termination orders for each child. The language contained in the termination orders and cited herein, however, is substantially the same, aside from the headings and other specific information pertaining to each child such as names, birth dates, etc. We therefore cite to only one of the termination orders.

9

approximately one month after completing the IOP. The evidence further establishes that Father failed to achieve any significant, long-term improvement in his ability to parent J.R. and L.R. despite a wealth of services available to him throughout the underlying proceedings.

During the termination hearing, DCS case manager Stephanie Neher ("Neher") informed the trial court that Father had failed to remedy "the reasons for removal with the drugs and the instability." *Tr.* at 110. Neher also explained that she had experienced significant difficulty in contacting Father throughout the duration of the underlying proceedings, that Father repeatedly refused to participate in child and family team meetings despite having knowledge of said meetings, and that although there was a "short period of time from January to March [2011] that he was doing rather well, and [Neher] had hopes that [Father] would make it[,]… [Father] relapsed and went downhill from there." *Id.* at 121.

Drug and Alcohol Counselor Deborah Carithers ("Carithers") likewise testified that although Father had been an "active participant" and had done "quite well" during the IOP classes, he later refused her offer to "come back as an alumni [sic]" and seek help following his relapse. *Id.* at 64, 66. Carithers also testified that without a support system, Father's prognosis for successfully kicking his addiction to methamphetamine was "Guarded," explaining that although it is possible, she had "never known anybody personally that did it without some kind of support." *Id.* at 68. As for visitation, home-based services counselor Jan Shaver ("Shaver") informed the trial court that Father never progressed from fully-supervised visits with the children. Shaver also confirmed that

10

Father's participation in home-based services became irregular after Father moved out of the paternal grandfather's home, and that Father's housing situation never improved.

Father's own testimony lends further support to the trial court's judgment. During the termination hearing, Father confirmed that he was currently incarcerated, had drug-related criminal charges pending in two separate counties, and was unavailable to care for the children at that time. Father further admitted that he had failed to obtain employment or stable housing since the time the children were removed from his care, was on the run from police for several months leading up to the termination hearing, had failed to visit with the children since July 2011, never participated in any after-care substance abuse treatment program, such as AA or NA, and never asked service providers for help following his relapse in April 2011.

As noted above, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child. *D.D.*, 804 N.E.2d at 266. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, the record makes clear that throughout the underlying proceedings Father demonstrated a persistent unwillingness and/or inability to take the actions necessary to show that he is capable of (1) overcoming his addiction to methamphetamine and other substances and (2) providing J.R. and L.R. with the safe, stable, and drug-free home environment which the children need to thrive. Based on the foregoing, we conclude that the trial court's

11

determination that there is a reasonable probability the conditions resulting in the children's removal and continued placement outside Father's care will not be remedied is supported by clear and convincing evidence. Father's arguments to the contrary, emphasizing his self-serving testimony rather than the evidence cited by the trial court in its termination order, amount to an invitation to reweigh the evidence, which we may not do. *See D.D.*, 804 N.E.2d at 265.

## II. Best Interests

We next consider Father's assertion that DCS failed to prove termination of his parental rights is in J.R.'s and L.R.'s respective best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the findings previously cited, the trial court made several other pertinent findings relating to J.R.'s and L.R.'s best interests. Specifically, the trial court noted that during the summer and fall of 2011 Father had "no meaningful contact" with the

12

children, and the court-appointed special advocate ("CASA") was unable to talk with, "let alone work with" Father during that time. *Appellant's App.* at 87-88. The court also found that J.R. and L.R. were thriving in relative foster care placement, that the Guardian ad Litem had recommended termination of Father's parental rights, and that the children had "settled into a pattern of school attendance and sports involvement which would be disrupted" if they were reunified with Father. *Id.* at 88. Finally, the trial court specifically found that Father continued to struggle with "substance abuse and the subsequent entanglements resulting from criminal charges related to possession of controlled substances," did not have a "steady job or a suitable residence" for the children, and currently had "no way to provide care" for the children. *Id.* Based on these and other findings, the trial court concluded that termination of Father's parental rights is in both children's best interests. These findings, too, are supported by the evidence.

During the termination hearing, CASA Tony Magna ("Magna") informed the trial court that in March 2011 he "really had high hopes" that Father would be successful in services and that reunification would be possible, but "all of a sudden everything went downhill" for Father. *Tr.* at 98. In recommending termination of Father's parental rights, Magna testified that he was "very comfortable" with the children's current pre-adoptive relative placement with their aunt and uncle and believed that the children had the chance for a "really good future" with the relative placement. *Id.* at 98, 100. Magna further indicated that although J.R. loves Father, the child also "loves" and feels "safe and secure" with his aunt and uncle. *Id.* at 99. Case manager Neher likewise confirmed that both children were "doing wonderful[ly]" in their current relative care placement, that J.R. was

13

an "honor roll" student, and that both children needed a "stable and safe home with permanency." *Id.* at 109, 124.

Based on the totality of the evidence, including Father's current incarceration, unresolved struggle with substance abuse, and failure to successfully complete and/or benefit from a wealth of reunification services available to him during the underlying proceedings, coupled with the testimony from the DCS case manager Neher and CASA Magna recommending termination of the parent-child relationships, we conclude that there is sufficient evidence to support the trial court's determination that termination of Father's parental rights is in J.R.'s and L.R.'s respective best interests. *See*, *e.g.*, *In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

NAJAM, J., and MAY, J., concur.